Filed 6/11/26  P. v. Delvalle CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS MIGUEL DELVALLE,<br><br>    Defendant and Appellant. | C101269<br><br>(Super. Ct. No. 21FE015343) |

A jury found defendant Luis Miguel Delvalle guilty of the first degree felony murder of Toriano Mason and found true that defendant personally discharged a firearm, causing the victim's death.  The jury further found defendant guilty of attempting to dissuade a key witness, K.S.,[1] by threat of force or violence.  The trial court sentenced defendant to a total term of 50 years to life plus four years in state prison.

Defendant appeals contending:  (1) insufficient evidence supported his conviction for witness dissuasion; and (2) defense counsel was ineffective for failing to request an instruction on a claim-of-right defense to the felony murder charge.  We disagree and affirm the judgment.

---

[1]    To protect the witnesses' privacy, we will refer to them by their initials.  (Cal. Rules of Court, rule 8.90(b)(4) and (10).)

# FACTUAL AND PROCEDURAL BACKGROUND

K.S. met defendant in August 2021.[2] They entered into a romantic relationship and spent a week together driving around in her SUV. During this time, K.S. was using fentanyl and drinking liquor.

On the evening of August 25, 2021, the victim's cousin, J.C., called the victim and asked to see him. They met in an apartment complex, then the victim walked back to his truck parked in front of the complex. The victim said he was going to relax and hang out in his truck. It was typical for the victim to sit in his truck in front of the apartment complex.

On August 25, 2021, K.S. and defendant parked at sunset on a dead-end street that ended in a loop near a liquor store. They were smoking in the vehicle. K.S. was also drinking alcohol and using opiates. Later that night, they went to pick up defendant's friend Will Eckes. Defendant talked about the victim, saying they were "trying to retrieve his gun that he had." Defendant and Eckes "were planning it." Later that night defendant, K.S., and Eckes went back to the loop near the liquor store. K.S. saw a person parked in a truck on the street. Defendant talked to Eckes about how the victim "was alone and they were trying to get his gun." In using the word "his," K.S. understood defendant to be referring to the victim.

Eckes put on a ski mask. Defendant approached the victim in the truck. Defendant wore a COVID mask and had a gun in his hand. K.S. heard defendant say something like "Give it up, [N-word]." K.S. then heard a bang. Defendant had a gun in his hand when he returned to the SUV. They drove away.

On August 25, 2021, A.W. was living in an apartment complex. The victim was her neighbor. The victim had a red truck, and A.W. would see him in it sometimes. The victim was mainly out there at night by himself. A.W.'s apartment had windows that

---

[2]     K.S. was given immunity to testify at trial.

faced the street. A.W. was in her room around 11:00 p.m., when she heard a loud pop noise that she was certain was a gunshot. Before the gunshot, she heard someone say, "Give me your gun, give me your gun." After the gunshot, A.W. heard a car screech. A.W. went outside and saw the victim with a bullet wound in his head.

The victim was pronounced dead at the scene. About three to four feet from the body, an officer found a Glock 9-millimeter semiautomatic pistol with a tactical light attached to the bottom and a fully loaded 17-round magazine. An RP 9-millimeter Luger shell casing was located about three to five feet from the body, and a live RP 9-millimeter Luger round was later found under the victim's body at the crime scene. The shell casing and the round recovered at the scene were not from the Glock 9-millimeter semiautomatic pistol. The victim's DNA was on the Glock, but defendant's DNA was not.

Dr. Jason Tovar, who performed the autopsy on the victim, determined he died of a gunshot wound to the head. There were also abrasions to the right side of his hip, to his knees on either side, and on the back side of his right wrist and right hand. Dr. Tovar testified that the small, red dot abrasions to the victim's right wrist could have been caused by a gunshot at close range.

In October 2022, an information charged defendant with one count of murder (Pen. Code, § 187, subd. (a))[3] with an allegation that defendant personally discharged a firearm causing great bodily injury or death (§§ 12022.53, subd. (d)).

In August 2023, K.S. received a threat on Instagram from Myra Renteria, the mother of defendant's child. The threat read: "Dead homie snitch. When I catch you I'm beating the fuck out of you. You want to pop up to my baby dad for a date, you little

---

[3]  Undesignated statutory references are to the Penal Code.

3

snitch ass bitch, dead homies."[4]  The message was followed by rat emojis.  K.S. understood "dead homies" to mean something like "I promise or I really mean it."  After K.S. received the threat, she stopped coming to court, and stopped returning calls from the prosecutor and the prosecutor's investigator, Scott MacLafferty.  MacLafferty eventually located K.S. in Los Angeles and brought her back in custody to Sacramento for the trial.

In February 2024, the trial court granted the People's motion to consolidate the murder charge with the case charging defendant with dissuading a witness by force or fear (§ 136.1, subd. (c)(1)).  The amended information alleged multiple aggravating circumstances.

At trial, defendant testified on his own behalf.  Defendant said he went to high school with the victim in 2016 or 2017.  They were acquaintances and had no problems with each other.

Defendant met K.S. on Instagram.  For two weeks in August 2021, they were in a romantic relationship and together every day.  Defendant saw K.S. consume Percocet and fentanyl.  Defendant knew K.S. took drugs because she told him, and he found drugs in her possession.  He could tell when K.S. was taking drugs because of how she was acting.  She hallucinated, saw things that were not there, and said things that were not true.  K.S. also had memory loss due to opiates.

On August 25, 2021, a couple of hours before the shooting, defendant was with K.S. at a place known as "the loop" near a liquor store.  Defendant was driving K.S.'s vehicle.  Defendant saw K.S. using drugs in the car.

---

[4]     Further evidence regarding this message is set forth in the discussion of defendant's claim that insufficient evidence supported his conviction for witness dissuasion.

4

Defendant and K.S. picked up Eckes and arrived back at the "loop" about 10:30 or 11:00 p.m. Defendant always went there to smoke. Defendant had lived around the corner and went there every day when he was a child. Defendant parked the vehicle and was outside smoking marijuana while on his cell phone.

It was dark, and the streetlight was not working. Defendant thought he saw someone he knew from long ago, the victim, who nodded at him. Defendant had seen him a few times at the apartment complex. Defendant was about 22 feet from the victim's truck. When the victim nodded, defendant thought he was beckoning him over and walked towards him. When defendant was about three feet away, he saw the victim pull out a gun. The victim's gun had a flashlight on the bottom.

Defendant had a gun on his right hip tucked in his waistband. Defendant dropped to the ground by the door to the victim's truck. He was trying to open the door, and defendant was pushing it to stop him. Defendant thought that if he tried to run, the victim would shoot him in the back. The victim was able to open the door a crack. Defendant panicked and yelled, "Hold on, man. Give–what you doing? Give me the gun. Just throw it away. Put it down." When defendant did not have enough strength to keep the door closed, he pulled his gun out of his waistband. Defendant did not want to shoot anyone but he was afraid. He jumped up and away from the truck and shot once through the vehicle window.

When defendant heard the victim's gun drop, defendant ran away and drove off with K.S. and Eckes. K.S. heard the bang and asked what happened. Defendant said he was sorry this had to happen.

Before the night of the shooting, defendant never mentioned the victim to K.S. Defendant never told K.S. he was planning to rob the victim.

Defendant testified he shot the victim in self-defense. Defendant did not go to the police because he was scared and thought they would not understand what he told them. Defendant lied in interviews with the police because he was scared and he panicked.

5

Defendant testified he never threatened K.S. and did not tell anyone to do anything to her. Defendant acknowledged that he called K.S. a rat in the recording of his jailhouse call with Renteria. Renteria is the mother of his child, and they are close. Defendant called K.S. a rat because he was mad that K.S. was saying things that were not true, and he did not want her to testify against him. K.S. said that defendant was trying to rob the victim, but that was not true. Defendant was not trying to send a message to Renteria by calling K.S. a rat and not trying to imply that Renteria do anything by calling K.S. a rat.

The jury found defendant guilty of first degree murder of the victim under a felony murder theory and found true that defendant personally discharged a firearm, killing the victim. The jury further found defendant guilty of dissuading a witness by threat of force or violence and found true that defendant acted maliciously in committing this offense. Defendant waived jury trial on the aggravating circumstances, three of which the trial court found true. The trial court sentenced defendant to 25 years to life for murder plus 25 years to life for discharging a firearm causing death, and four years for witness dissuasion. The court awarded defendant 973 days of presentence custody credit, imposed a restitution fine of $5,000 (§ 1202.4), imposed and suspended a parole revocation fine in the same amount (§ 1202.45), and ordered defendant to pay an $80 court security fee (§ 1465.8) and a $60 criminal conviction fee (Gov. Code, § 70373).

Defendant filed a timely notice of appeal.

## DISCUSSION

### *Witness Dissuasion*

Defendant contends there was insufficient evidence to support the jury's guilty verdict for witness dissuasion, because he did not send the threatening message to K.S. nor did he tell Renteria to threaten K.S. Defendant argues Renteria sent the Instagram message on her own, and defendant merely laughed at it, which was insufficient to prove that he aided and abetted witness dissuasion. The People counter that defendant made

6

inflammatory and provocative statements designed to induce Renteria to threaten K.S., thereby aiding and abetting the threat. We conclude a rational trier of fact could have determined defendant aided and abetted witness dissuasion by instigating or encouraging Renteria to threaten K.S.

A.    *Background*

At trial, the People relied on two telephone calls on August 7, 2023, that defendant made to Renteria from jail. Recordings of the calls were played to the jury. During the second call, Renteria sent K.S. the message she read at trial: "[D]ead homies bitch when I catch you I'm beating the fuck out of you. You want to pop up to my baby daddy's for a court date. You little snitch ass bitch. Dead homies."

In the first call, which was cut short, defendant told Renteria that on August 7, 2023, he saw K.S. at a court appearance, "Guess who I seen though, bro like which, why you even, why you even, like the fuck tell you, why you show up anyways though you feel me."

In the second call, Renteria asked why K.S. was in court. Defendant said, "Man bro, you don't even know bro, like. Ah cuz this bitch wanted me in jail for the rest of my life [N-word] and she know I'm coming home." Renteria asked the same question again and defendant said, "Bro I don't know bro, I'm looking at everybody in the court room, [N-word] my mom there and my brother there, which I see a couple females in the back, like, I'm looking in shit cuz you know I couldn't see em, I'm looking [N-word], this bitch I seen her, which I'm like what the fuck?"

Renteria asked why someone did not "scrape that bitch"[5] or "boo-bopped the bitch," and defendant responded that only his mother and brother were there. Renteria then said that it was "hella weird [unintelligible] that's weird as fuck" that K.S. would be

---

[5]    Investigator MacLafferty testified that "scrape" could mean "to take out, hurt."

in court.  Defendant responded, "Bro, yeah, like what the fuck, like bro this bitch, like bro you wanted me in jail for the rest of my life, bro you don't even know what this bitch said to me like bro, to the, to the police in shit like, and you want to show and shit.  Bruh, like what type of shit you on blood?  You feel me?"

Defendant added:  "Bruh, weird as fuck [N-word], cuz you know I just took my time today bruh.  I just took my deal so [N-word] I'm finna to, I don't know when I'm finna be leaving.  In a couple like three weeks I'm finna to be leaving like a month or month and a half or something like that.  Go to prison.  But, I just took my time just today though."

In response to a question from Renteria, defendant confirmed that K.S. was sitting with two other women on the opposite side of the courtroom from defendant's family.  Renteria then said she was going to text K.S.  Defendant responded, "I don't know when I'm gonna be gone bro.  But, yeah?  On God, like that shit crazy bro."  Renteria said that she would text that if she caught K.S. she would beat "the fuck out of you."

Renteria then told defendant she needed "the paperwork."[6]  Defendant responded, "On the gang, I could do that for sure.  I got that on this b like, what, I been waiting, man fuck that motherfucker.  On the gang [unintelligible].  You a rat, Snitch gang."  Defendant added, "Bro I'm like, bruh like.  Bruh like I'm just looking at everybody in the courtroom and shit, bro, I'm like oh hell nah.  Bitch, I'm like what the fuck.  Bitch, you just.  You was like, you was, bro you was a witness [unintelligible] man bruh.  I'm like that's crazy dude."

Renteria told defendant she had texted the message and took a screenshot of it, because Renteria planned to post it on Instagram, and "[i]t say y'all go blow this bitch up."  Defendant responded, "You hella funny.  You know, you hella funny like.  Fuck that bitch on this mean [unintelligible].  Like [N-word] got know bra that bitch is a rat

---

[6]      Investigator MacLafferty testified that "paperwork" refers to "police reports."

8

bro.  Is a known rat bro.  On my mommy [N-word].  A rat [N-word] on God [N-word].  Crazy bruh.  You post that muthafucka ma?"

After Renteria confirmed that she had posted the message on Instagram, defendant said he had more paperwork, and Renteria said, "I need the paperwork with that bitch car."  Defendant said he would get it to her and commented, "On God bro, I'm telling you bro like.  Bro that mothafuc [*sic*], I was already going to do that [N-word] in the first place bro, I swear to God [N-word], I was already gonna post that mothafucka [N-word] hear me?"  Renteria told defendant to send the paperwork so she could post it.  Defendant responded, "I will on God, I gonna send it to you though for real.  You're the first person I'ma send it to you ma.  On God and then post that motherfucka [N-word] [unintelligible] that ho [N-word] on my momma.  Is a known rat [N-word].  And anybody associate [*sic*] with that bitch [N-word] they on God [N-word], they a rat too [N-word]."  He added: "Yeah, whoever around that little ass ho bitch [N-word] around that bitch [N-word] you a rat [N-word]."  He repeated, "On god [N-word], anybody around that ho is a rat [N-word]."

Renteria said she wanted to record defendant talking, and he responded at length with statements that "Bitch you is a rat [N-word].  You told on a murder [N-word]."  He said again, "I juts [*sic*] took my deal though [N-word], so [N-word] I'm gonna be home soon though you feel me?  [¶]  Took my time [N-word].  A [N-word] gonna be back, on God.  But it's like bruh.  Who, bruh, you did all that extra shit bro all that little shit [N-word].  Statements and hella shit bruh.  Bitch and you still [unintelligible] come on bruh.  Bitch, I'm coming home [N-word].  You feel me?"  Defendant added, "I'm talking about now they wanted me in jail for the rest of my life my [N-word].  Like the shit that she was saying on the mothafucka.  Bro this bitch saying, lying.  I'm talking about like, lying bro, on God though [N-word] you feel me?  Like, I'm like bro, all this time that shit that she was saying bruh on God [N-word] on dead homie never happened bro, you feel me.  She was just putting hella extra words in the situation bro that wasn't even true bro."

9

Renteria said, "Now I'm gonna post it, I don't fuck with rats. Well, the bitch. LMAO. What she rat about?" Defendant said, "[N-word] on a murder [N-word]." Renteria said, "About … my baby daddy. He rat about my baby daddy smokin a [N-word]." Defendant responded, "Told on a murder [N-word]. Ay bro, I been wanting to tell you that. I swear bro like anybody that's been kicking it with her bro. She's a rat bro on my momma bro. Acting like she. She acting like she, ain't nobody gonna find out or something, ain't nobody not gonna find out bro. Cuz she think she from Oak Park in shit. Bitch. Kicking around with everybody. You feel me. Bitch when this paperwork goes out there bro and you told? Like bro come on my [N-word]. Bitch you, you is a witness my like come on bruh. Type of shit you on bro? It's like bitch I'm in jail for this shit bruh. Bootsie bruh. Post that. On this B [N-word]. Baby tho, you hella funny put the rat emoji on that mothafucka?" Renteria assured him that she had posted the Instagram message.

The trial court instructed the jury on: (1) two ways a person may be guilty of a crime, as a direct perpetrator or aiding and abetting a direct perpetrator (CALCRIM No. 400); (2) the elements of aiding and abetting a crime (CALCRIM No. 401); (3) the elements of intimidating a witness, K.S. (CALCRIM No. 2622); and (4) the elements of acting maliciously in intimidating a witness (CALCRIM No. 2623).

In closing argument, the prosecutor told the jury that under an aiding and abetting theory, defendant was guilty of witness intimidation because he encouraged and instigated Renteria to commit the crime. Defense counsel argued defendant did not instigate the threat to K.S. but that Renteria brought it up on her own. Counsel further asserted that, while there was discussion about paperwork, defendant never provided anything to anyone about K.S. Defendant also did not promote or encourage Renteria to put the threat on Instagram; he just expressed a desire that K.S. not testify and laughed as Renteria was committing the crime.

B.    *Analysis*

Criminal judgments must be supported by evidence sufficient to persuade a reasonable jury of guilt beyond a reasonable doubt.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1138.)  "In determining the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citation.]  '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Leon* (2008) 161 Cal.App.4th 149, 156.)

As relevant here, section 136.1 provides that anyone who knowingly and maliciously dissuades a witness from giving testimony at trial by an express or implied threat of force or violence is guilty of a felony.  (§ 136.1, subds. (a), (c)(1).)  "There is, of course, no talismanic requirement that defendant must say, 'Don't testify' or words tantamount thereto, in order to [commit the offense].  As long as his words or actions support the inference that he (1) sought to prevent or dissuade a potential witness from attending upon a trial [citation] or (2) attempted by threat of force to induce a person to withhold testimony [citation], a defendant is properly" convicted of violation of section 136.1, subdivision (c)(1).  (*People v. Thomas* (1978) 83 Cal.App.3d 511, 513; see also *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344.)  Section 136.1 does not restrict "the means a defendant selects to commit the offense, nor does it require [that] the defendant personally deliver the message to the witness.  A threat need not actually deter or reach the witness because the offense is committed when defendant makes the attempt to dissuade the witness."  (*People v. Foster* (2007) 155 Cal.App.4th 331, 335.)  In addition, where "the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the

11

witness from testifying, the offense has been committed." (*People v Wahidi* (2013) 222 Cal.App.4th 802, 806.)

As mentioned, the prosecution's theory was that defendant aided and abetted Renteria in threatening K.S. " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging the commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*People v. Leon, supra*, 161 Cal.App.4th at p. 157.) The requisite mental state is that the aider and abettor " ' "act[ed] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose of committing, or of encouraging or facilitating commission of the offense." ' " (*People v. Atkins* (2001) 25 Cal.4th 76, 92.) " '[A]mong the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Here, defendant's close relationship with Renteria as the mother of their child is evidence that he aided and abetted her threats to K.S. (*People. v. Campbell, supra,* 25 Cal.App.4th at p. 409.)  Defendant acknowledged in his testimony that Renteria was the mother of their child and they were close.  Throughout the jailhouse calls defendant and Renteria repeatedly referred to their relationship, as did Renteria in the text message and Instagram post.

Defendant's statements encouraged and instigated Renteria to threaten K.S.  (See *People v. Leon, supra,* 161 Cal.App.4th at p. 157.)  Before Renteria texted K.S. and before she posted the text on Instagram, defendant told Renteria he saw K.S. in the courtroom, and Renteria simply asked why she was there.  Defendant told Renteria that K.S. was a witness who wanted him to serve a life sentence and knew he was coming home.  Defendant claimed that he was in court that day to take a plea deal and questioned why K.S. would be sitting in the courtroom on the opposite side from his family.  This

prompted Renteria to tell defendant, "I'm texting her right now. I'm telling her when I catch you bitch, I'm beating the fuck out of you."

Defendant then called K.S. a "rat" and a "[s]nitch" and told Renteria that he looked around the courtroom, realized why K.S. was there, and thought, "oh hell nah. Bitch, I'm like what the fuck. Bitch, you just. You was like, you was bro you was a witness…." This prompted Renteria to tell defendant she was going to post the text on Instagram, which defendant confirmed she did when he said, "You post that muthafucka ma?" Investigator MacLafferty testified that posting a threat on Instagram "could cause [someone] a lot of fear and intimidation, having to look over their shoulder, not wanting to cooperate, disappearing so others that see that … can't find them." K.S. testified that, after she received the threat from Renteria on Instagram, K.S. received other threats "from fake accounts or just accounts that I don't know."

From these exchanges, a jury could reasonably infer that defendant conveyed to Renteria that, unless stopped, K.S. was in court to sabotage his plea agreement and testify in order to send him to prison for life, which prompted Renteria to text a threat to K.S. and then post the text on Instagram. Thus, defendant encouraged and instigated the commission of the offense.

Defendant argues his response to Renteria's texting and posting threats to beat K.S. was merely to laugh about it, which was insufficient to prove aiding and abetting. Defendant, however, did more. Defendant told Renteria he would give her police reports and told her expressly to post them so that everyone would know that K.S. was a "known rat," i.e., a witness who talked to the police. Renteria also asked for police reports to identify K.S.'s car to elevate the threat. Defendant said he was already going to post that information, and Renteria told him to send it to her to post.

Defendant emphasizes there is no evidence that he provided any police reports to Renteria. The record, however, is clear that defendant, by offering to send Renteria the "paperwork," sought to facilitate Renteria's attempt to discourage K.S from testifying by

13

threats, encouraged Renteria to post police reports, and declared that he wanted to do it himself. This is substantial evidence that defendant aided and abetted witness dissuasion, whether or not Renteria received the paperwork or posted it. (See *People v. Foster, supra*, 155 Cal.App.4th at p. 335.)

Defendant relies on *People v. Leon, supra,* 161 Cal.App.4th 149, which reversed the defendant's conviction for aiding and abetting witness dissuasion. In that case, the defendant was with a fellow gang member burglarizing cars in a parking lot when one witness yelled, " 'I'm going to call the police. You guys better leave.' " (*Id.* at pp. 153-154.) The other gang member looked at the witness and fired a gun in the air. (*Id.* at p. 154.) The prosecution claimed the defendant was " 'staring' " at the witness. (*Id.* at p. 159.) The appellate court said that, assuming " 'staring' " at a witness could support aider and abettor liability, there was no evidence that the defendant did. (*Ibid.*)

Here, defendant told Renteria, the mother of their child, that he had accepted a plea deal and would be home soon, but K.S. was a witness to the murder who had talked to police and had appeared in court possibly to testify against defendant and send him to prison for life, which prompted Renteria to threaten K.S. by text and Instagram. This case is unlike *Leon*. In any event, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

We conclude ample evidence supports the jury's conclusion that defendant aided and abetted the crime of dissuading a witness.

### *Ineffective Assistance of Counsel*

Defendant contends defense counsel was ineffective for failing to request an instruction or present evidence on a claim-of-right defense. This contention is based on snippets of K.S.'s testimony involving the pronoun "his" that defendant misinterprets as referring to himself. The prosecutor, however, made sure that K.S. clarified that

defendant used the word "his" to refer to the victim, not defendant. Defense counsel was not ineffective for failing to request an instruction for which there was no evidentiary support.

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

A bona fide belief that one has a right or claim to property negates the intent to steal for robbery. (*People v. Tufunga* (1999) 21 Cal.4th 935, 943.) Defendant argues that this claim-of-right defense could have negated the robbery element on which his conviction for felony murder was based. (See *Tufunga,* at p. 943.) Defendant faults his trial counsel for presenting only the defense of imperfect self-defense, a valid defense to deliberate and premeditated murder but not to felony murder, of which defendant was found guilty by the jury. (See *People v. Seaton* (2001) 26 Cal.4th 598, 665; *In re Lucero* (2011) 200 Cal.App.4th 38, 46.)

"Generally, '[a] party is not entitled to an instruction on a theory for which there is no supporting evidence." [Citation.] '[A] trial court is not required to instruct on a claim-of-right defense unless there is evidence to support an inference that [the defendant] acted with a subjective belief he or she had a lawful claim on the property.' " (*People v. Tufunga, supra*, 21 Cal.4th at p. 944.)

15

Here, there was no such evidence. Defendant argues there was evidence because K.S. testified that defendant talked about doing the following to the victim: "Um, trying to retrieve his gun that he had." Defendant interprets "his gun" to refer to himself and "he had" to the victim. Defendant also relies on K.S.'s testimony that she overheard defendant and Eckes talking about the victim "that he was alone and that they were just trying to get his gun." Again, in this interpretation, the pronoun "he" supposedly refers to the victim, but "his" in "his gun" refers to defendant. Based on syntax alone, however, this testimony is clear enough that the words "he" and the words "his" refer to the same person, the victim. In addition, the prosecutor clarified with K.S. that, when defendant used the pronoun "his," defendant was referring to the victim. Defendant points to nothing else in K.S.'s testimony to support a reasonable inference that the gun in question belonged to anyone but the victim.[7]

While defendant contends there can be no satisfactory explanation for defense counsel's failure to request a claim-of-right instruction, counsel could have recognized that, based on K.S.'s testimony, there was no evidence that the victim had defendant's gun, and therefore no basis for this instruction. Failure to request an instruction unsupported by substantial evidence is not ineffective assistance. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1052; *People v. Smith* (2021) 70 Cal.App.5th 298, 313, fn. 24.)

Defendant also asserts that had defense counsel pursued a claim-of-right theory, "it is likely he could have produced evidence to support such a theory." Speculation regarding evidence that might have been produced cannot support an ineffective assistance claim. (*People v. Anderson* (2001) 25 Cal.4th 543, 578 ["appellate claim of ineffective assistance cannot be based on speculation about available evidence"].)

---

[7] In her interview played to the jury, K.S. told a police detective that defendant and Eckes "were tryin' to get his gun I believe." The detective asked, they "were trying to get [the victim's] gun?" K.S. responded, "Mm-hmm."

Defendant has failed to carry his burden to show ineffective assistance of counsel.

DISPOSITION

The judgment is affirmed.

\s\
KRAUSE, Acting P. J.

We concur:

\s\
BOULWARE EURIE, J.

\s\
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17